| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION COUNTY SUPERIOR COURT |
| | )SS: | CIVIL DIVISION |
| COUNTY OF MARION | ) | CAUSE NO. _____ |

JANE DOE, individually and as parent and )
next friend of JOHN DOE, a minor child )
)
        Plaintiff, )
)
v. )
)
METROPOLITAN SCHOOL DISTRICT )
OF WAYNE TOWNSHIP; JEFFERY )
BUTTS, individually and in his official )
capacity; SANDRA SQUIRE, individually )
and in her official capacity; DANTE )
BROWN, individually and in his official )
capacity; SAMANTHA JOHNSON, )
individually and in her official capacity, and )
CONNER EDWARDS, individually and )
in his official capacity. )
)
        Defendants. )

## COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL

    Plaintiff, Jane Doe, individually and as parent and next friend of John Doe, a minor child, by counsel, files this *Complaint for Damages and Request for Jury Trial* against Defendants Metropolitan School District of Wayne Township, Jeffery Butts, Sandra Squire, Dante Brown, Samantha Johnson, and Conner Edwards to recover damages and other relief resulting from the Defendants' negligent and tortious conduct and violations of John Doe's rights under Indiana Law and the United States Constitution and Code.

    This case concerns egregious negligence and abuse in a public school, violations of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, and the unconscionable abuse and neglect of one of society's most vulnerable children. At its core, this matter arises from the defendants' systemic failure to protect, supervise, and provide even the most basic care and dignity to a child with profound disabilities, an individual wholly dependent on

1

those entrusted with their safety and well-being. Instead of upholding their legal and moral duties, the defendants allowed conditions and conduct so reckless, so indifferent, and so devoid of humanity that they amount to a violation not only of federal law, but of the most fundamental standards of decency.

The defendants' actions, including taking pictures of the child completely nude, unattended, and humiliated, and in many instances, their deliberate inaction, constitute a pattern of neglect and abuse that would be intolerable in any setting, but are particularly abhorrent here, where the victim was a defenseless child who is both blind and deaf under their exclusive supervision and control. What occurred is not merely a failure of judgment or training; it is a collapse of responsibility, accountability, and compassion.

This Court is now called upon to address conduct that not only violates statutory mandates, but betrays the very principles those laws were designed to safeguard: equal protection, human dignity, and the right of every child, especially those with disabilities, to safety, care, and respect. In support of this *Complaint for Damages* respectfully states the following:

## I.    PARTIES

**<u>Plaintiff</u>**

1. Plaintiff John Doe ("John") is a sixteen-year-old minor child and at all relevant times, a student within Metropolitan School District of Wayne Township ("School").

2. Plaintiff John Doe is both deaf and blind. He is only able to detect light and shadows in both of his eyes and is completely deaf, only able to perceive the physical sensation of vibrations.

3. Plaintiff John Doe is a "qualified individual with a disability" under 42 U.S.C. 12101, et seq.

4. Plaintiff John Doe receives special education services under an Individualized Education Plan ("IEP") at School and is entitled to other accommodations at School based on his disabilities.

5. Plaintiff John Doe was, at all times relevant, entrusted to the care and supervision of the School.

6. Plaintiff Jane Doe is the parent and legal guardian of John Doe and was the parent and legal guardian of John Doe at all relevant times.

7. John Doe and Jane Doe are residents of the County of Marion, State of Indiana, and were residents at all times referenced herein.

**Defendants**

8. Defendant Metropolitan School District of Wayne Township is a school district located in Indianapolis, Indiana, in the County of Marion. Its principal office is located at 1220 South High School Road, Indianapolis, IN 46241.

9. Defendant Metropolitan School District of Wayne Township is an Indiana public school corporation as defined by IC § 20-26-2-4.

10. Defendant Metropolitan School District of Wayne Township is a local educational agency within Indiana and is a recipient of federal financial assistance.

11. Defendant Metropolitan School District of Wayne Township is a "public entity" under 42 U.S.C. § 12101, et seq.

12. Ben Davis High School ("Ben Davis") is a school within Metropolitan School District of Wayne Township. It is located at 1200 N Girls School Rd, Indianapolis, IN 46214.

13. Chapel Hill 7th & 8th Grade Center ("Chapel Hill") is a school within Metropolitan School District of Wayne Township. It is located at 7320 West Tenth Street, Indianapolis, IN 46214.

14. Defendant Jeffery Butts ("Defendant Butts") was at all relevant times, the Superintendent at the School. As Superintendent, Defendant Butts was the highest-ranking administrator for the School. He was responsible for ensuring the hiring, firing, training, and supervising of principals, teachers and other employees necessary to the operation of the schools. He was also responsible for carrying out the policies of the School and the State of Indiana's Department of Education and ensuring the School's compliance with federal and state law. His duties, in addition to compliance with State law, included ensuring compliance with the ADA and Section 504, and ensuring that School staff and cooperative employees followed the requirements of the law and provided the necessary guidance, training, policies, structure, consistency, and behavioral supports that would enable children with disabilities equal access to the services, programs, and activities of the School.

15. Defendant Butts is sued in both his official capacity as an employee of the School and his individual capacity. Under Ind. Code § 34-13-3-5 (c), Defendant Butts is personally liable for any acts set forth below where he acted willfully, maliciously, clearly outside of his employment, or for his personal benefit.

16. Defendant Sandra Squire ("Defendant Squire") was at all relevant times, the Principal at Ben Davis. Defendant Squire was responsible for hiring, firing, training, and supervising teachers and other employees necessary to the operation of the School at Ben Davis. She was also responsible for carrying out the policies of the School and the State of Indiana's Department of Education and ensuring the school's compliance with federal and state law. Her duties in addition to compliance with State law included ensuring compliance with the ADA and Section 504 and ensuring that school staff and cooperative employees followed the requirements of the law and provided the necessary guidance, training, policies, structure, consistency, and behavioral supports that would enable children with disabilities equal access to the services, programs, and activities of the School.

17. Defendant Squire is sued in both her official capacity as an employee of the School and her individual capacity. Under Ind. Code § 34-13-3-5 (c), Defendant Squire is personally liable for any acts set forth below where she acted willfully, maliciously, clearly outside of her employment, or for her personal benefit.

18. Defendant Dante Brown ("Defendant Brown") was, at all relevant times, the Coordinator of Special Services at the School. Defendant Brown was responsible for coordinating and overseeing the provision of special education and related services to students with disabilities within the School. He was also responsible for ensuring that the School complied with federal and state special education laws, including the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act ("ADA"). His duties included developing and implementing procedures to ensure that students with disabilities received appropriate evaluations, individualized education programs ("IEPs"), accommodations, and supports. He was further responsible for collaborating with teachers, staff, and administrators to ensure that educational programming and services were delivered in compliance with applicable law and that staff were provided with the necessary training, resources, and supervision to support students with disabilities' equal access to the School's educational programs, services, and activities.

19. Defendant Brown is sued in both his official capacity as an employee of the School and his individual capacity. Under Ind. Code § 34-13-3-5 (c), Defendant Brown is personally liable for any acts set forth below where he acted willfully, maliciously, clearly outside of his employment, or for his personal benefit.

20. Defendant Samantha Johnson ("Defendant Johnson") was at all relevant times, a special education teacher at the School. During the time of the event alleged herein, she was acting under color of law in her official capacity as teacher. Her duties included supervising

5

students under her care while on School property, actively monitoring student behavior to ensure student safety and prevent student harm, providing or procuring appropriate therapeutic interventions when necessary, implementing IEPs for special education students, and providing necessary tailored support for students with disabilities. Additionally, she was responsible for upholding all federal and state laws and for providing the structure and support necessary to ensure children with disabilities had equal access to the School's services, programs, and activities.

21. Defendant Johnson is sued in both her official capacity as an employee of the School and her individual capacity. Under Ind. Code § 34-13-3-5 (c), Defendant Johnson is personally liable for any acts set forth below where she acted willfully, maliciously, clearly outside of her employment, or for her personal benefit.

22. Defendant Conner Edwards ("Defendant Edwards") was, at all relevant times, a special education teacher at the School. Specifically, Defendant Edwards was John's Teacher of Record. During the time of the event alleged herein, he was acting under color of law in his official capacity as teacher. His duties included supervising students under his care while on School property, actively monitoring student behavior to ensure student safety and prevent student harm, providing or procuring appropriate therapeutic interventions when necessary, implementing IEPs for special education students, and providing necessary tailored support for students with disabilities. Additionally, he was responsible for upholding all federal and state laws and for providing the structure and support necessary to ensure children with disabilities had equal access to the School's services, programs, and activities.

23. Defendant Edwards is sued in both his official capacity as an employee of the School and his individual capacity. Under Ind. Code § 34-13-3-5 (c), Defendant Edwards is personally

liable for any acts set forth below where he acted willfully, maliciously, clearly outside of his employment, or for his personal benefit.

## ALLEGATIONS COMMON TO ALL COUNTS

24. John Doe is a sixteen-year-old highly disabled student assigned to the tenth grade.

25. Due to his deaf-blind status, modes of communication are extremely limited for John Doe due to the long-term failure of the school system to teach him communication or to utilize communication techniques common for blind and deaf children. He is responsive to touch prompts and the hand-over-hand technique – a communication strategy in which another person places their hands over John's hands to guide him through a task. While he can understand these types of prompts given by another person, he is unable to communicate his own wants and needs. This, along with his limited ability to perceive his surroundings, makes him extraordinarily vulnerable at all times.

26. He is able to toilet with supervision and touch prompts, but he also uses incontinent briefs at school.

27. John requires one-on-one, hands-on care all day from a person who understands his needs in order to safely navigate any environment.

28. John has other physical challenges in addition to being deaf and blind. He is very underweight, and he struggles to gain or maintain weight. He has struggled to maintain and gain weight for several years, but in 2024, he was diagnosed with limb girdle muscular dystrophy.

29. His physician has stated in a letter to the School that John is to have multiple opportunities to eat throughout the day and is to be given double portions of the entrée in his cafeteria lunch.

30. John began attending Chapel Hill in 2022 or 2023. Since that time, John has shown regression in critical communication skills, increased difficulties maintaining his

bodyweight, and increased aggressive and self-injurious behaviors.

31. Chapel Hill failed to provide a consistent or competent one-on-one aide for John. His assigned aides were inexperienced and unequipped to handle John's extremely high level of needs. They were also not trained in any communication strategies for deaf-blind individuals.

32. Before attending Chapel Hill, John had learned how to use several American Sign Language ("ASL") signs.

33. However, when he transitioned to Chapel Hill, the staff neglected to use signs with him, and he regressed in his understanding and use of ASL to the point that he no longer used signing as a form of communication for the remainder of his time attending the School. The School also frequently called the parent providing they did not have the staff to handle the child that day.

34. Over the course of the school year, the School's calls became routine – each time insisting that John be picked up early or excluded from attendance entirely. As a result, this vulnerable child was denied nearly 50 percent of his education, and stripped of the consistency, care, and learning environment to which he was legally and morally entitled.

35. The greatest injustice John suffered was not merely that he was unlawfully excluded from full participation in his education, but instead was what occurred when he was permitted to attend.

36. First, while enrolled at Chapel Hill in Defendant's district, John began exhibiting increasingly alarming and deeply distressing behaviors that grew in both frequency and severity. He began forcefully banging his head against hard surfaces, clawing, kicking, and biting staff members sometimes to the point of drawing blood. These were not the random outbursts of a child with disabilities. They were unmistakable signs of trauma, fear, and a desperate attempt to communicate distress in an environment where his voice was neither

8

heard nor respected. John's regression reflected not an internal disorder, but the external consequences of neglect during the school day.

37. In July 2024, John was transferred to Ben Davis. Almost immediately, his mother, Jane Doe, observed another disturbing, and this time very dramatic, shift. Each morning, as she prepared him for school, John would cry inconsolably and resist leaving home. This was entirely uncharacteristic. Though John sometimes struggled with transitions, he had always found comfort and joy in the social interactions school provided. His sudden dread of attending Ben Davis could not be explained away as adjustment. It was a child's visceral reaction to an environment that had become a source of fear.

38. As the 2024–2025 school year progressed, John's behaviors deteriorated even further. He continued having outbursts at School. These behaviors were a direct result of the trauma and abuse he suffered at School. For example, he bit defendant Johnson when she tried to force-feed him.

39. For the first time, during the 2023-2025 school year, John's aggression followed him home, manifesting in ways his mother had never seen. He lashed out physically, appeared constantly on edge, and withdrew emotionally. Jane Doe, desperate to understand, initially attributed his changes to the challenges of adapting to a new school. But in truth, these were the unmistakable signs of a child enduring harm and emotional trauma. The pattern was clear – the more time John spent at school, the more his physical, emotional, and behavioral health unraveled.

40. The first signs of danger appeared when John began returning home from school with unexplained bruises. Alarmed and fearful for her son's safety, Jane Doe immediately notified the School and expressed her concerns directly to John's teachers. Rather than respond with the care and urgency that the situation demanded, the School's staff dismissed

her concerns outright, offering a perfunctory and deeply troubling explanation, that John was somehow injuring himself while under their supervision.

41. This response was not only inadequate but unconscionable. Prior to Jane Doe's report, no one from the School had ever informed her that John was allegedly harming himself at school. The sudden appearance of these injuries, coupled with the School's complete failure to notify her, raised immediate and serious concerns. Jane Doe was aware that her son occasionally exhibited self-injurious behaviors, however, she had *never* witnessed him inflict visible bruises or marks upon himself. The School's attempt to deflect responsibility was both implausible and indicative of a reckless disregard for John's well-being.

42. In late August, Jane Doe brought John to his primary care physician to address her escalating concerns. A urine test confirmed there was no infection, injury, or medical cause that could explain his suffering. The physician also documented that John had lost six pounds since the start of the school year – a drastic decline for a child of his age and size. Jane Doe reported her belief that John was not being adequately fed or cared for during the school day.

43. As the school year progressed, Jane Doe's alarm deepened. Each day, her trust in the School eroded further as the bruises continued and the School's indifference persisted. It became painfully clear that the environment was neither safe nor properly supervised. Yet, faced with limited alternatives and bound by compulsory attendance laws, Jane Doe felt she had no choice but to continue sending her son to school. Each morning was filled with dread, and each afternoon was a question of whether he would return home unharmed.

44. On multiple occasions, the School directed Jane Doe to retrieve her son early, explaining that John was "upset" and that staff were "unable to calm him." The School routinely attributed John's distress to vague and shifting explanations, suspected physical ailments, tooth pain, stomach issues, or other supposed medical causes.

45. Acting as any conscientious parent would, Jane Doe immediately sought medical answers. She took John to numerous physicians and dentists submitting him to repeated examinations and tests. Yet every medical professional reached the same conclusion – there was no identifiable physical condition that could account for John's pain, agitation, or distress.

46. Shortly thereafter, Jane Doe began observing deeply alarming changes at home. John, who had previously communicated his needs clearly by tapping to request assistance, began withholding his urine and crying in visible anguish when he needed to relieve himself. This was a dramatic and uncharacteristic change. His behavior reflected not a physical limitation, but a profound fear. A fear that no child should ever associate with a basic bodily function.

47. During the school year, his penis also began to show signs of bruising and blisters, which Jane sought medical care for.

48. As the school year continued, John's condition spiraled. His energy waned, and his once-active nature documented throughout records gave way to listlessness. By midyear, the vibrant child who had once played and engaged now spent his days sitting or lying down, too weak to participate and too withdrawn to interact. He stopped signaling when he needed to use the restroom. He stopped responding to touch. He stopped reaching out at all.

49. These were not the ordinary challenges of a child with disabilities. They were the unmistakable symptoms of trauma and neglect.

50. At an appointment with John's genetic specialist on February 5, 2025, the doctor documented that John exhibited progressive muscle weakness.

51. Jane Doe continued to try to seek answers from the School and contacted multiple school employees. In early 2025, a concerned staff member, deeply disturbed by the neglect she

was witnessing, took the extraordinary step of reaching out directly to Jane Doe after she had gone to school administration repeatedly and without response.

52. The School staff member began sending Jane photographs and videos documenting the conditions in which John was being kept at school. What those images revealed was horrifying. John was isolated, appeared visibly distressed, cried uncontrollably, and was in clear emotional pain. The videos showed him isolated, left alone, and deprived of care or supervision. Some depicted him in moments of profound vulnerability, including while seated on the toilet or lying in a bean bag chair, sobbing, and with no staff offering comfort or assistance.

53. At least one video showed John in a state of undress while Defendant Edwards appeared to be taking photographs of his fully naked exposed body and penis. Another video appeared to show John masturbating at School in front of staff members.

54. In at least one additional video, other staff members can be seen using their personal cell phones to record John while he was unclothed and visibly distressed. These actions, utterly indefensible under any standard of professional conduct, constituted not only a shocking violation of John's privacy and dignity, but also a grave breach of the School's legal and ethical obligations to protect a disabled child entrusted to its care.

55. On March 16, 2025, the situation reached a breaking point. When Jane arrived, John's one-on-one aide asked to speak privately with her. What the aide disclosed confirmed Jane's worst fears and revealed neglect of a scope and severity no parent should ever have to imagine. The aide explained that whenever she was not present, John was routinely left alone, placed in a bean bag chair for hours at a time, ignored by staff, and deprived of all communication or engagement. She also witnessed Defendant Edwards physically restrain John on multiple occasions. His educational plan, the very framework intended to protect and support him, was systematically disregarded, and he was regularly being abused. Even

when the classroom was fully staffed, John was denied essential services such as physical and occupational therapy.

56. The aide, visibly shaken, told Jane that John was *not safe* at school. She reported that she had repeatedly gone to school administrators to report the abuse and mistreatment of John, but her pleas were ignored. School administrators including Defendant Butts, Defendant Squire, and Defendant Brown ratified the abusive and discriminatory treatment of John. Particularly, Defendant Brown was responsible for the many occasions when John's mother was called to pick up him up from School merely because Defendant Brown did not want to "deal" with John.

57. Jane Doe was devastated by what she heard. The information confirmed not only her longstanding suspicions, but something far more disturbing – her son had not simply been neglected. He had been subjected to inhumane and degrading treatment. Overcome with anguish and fear for her child's safety, Jane withdrew John from the School immediately. He has not returned since March 19, 2025.

58. The conditions described by the aide and documented in photographic and video evidence reflect not mere negligence, but a collapse of duty so profound that it defies comprehension. The School's conduct constituted a complete abdication of its legal and moral responsibility to protect one of its most vulnerable students. What happened to John under its supervision was not education; it was suffering.

59. Jane Doe, after confirming the extent of the conditions her child was enduring, removed him from the school system.

60. On September 25, 2025, John's primary care physician wrote a letter recommending that John continue homebound education as his documented decline over the past two years had made it impractical for him to now attend school in person. This decline occurred under the School's care and is a direct result of the School's ongoing neglect and abuse.

61. The School's prolonged neglect of John, as well as staff members' videoing this child while nude, has been reported to the Department of Child Services, and an investigation is ongoing.

62. A tort claim notice was timely filed in this matter.

## CLAIMS FOR RELIEF

## COUNT I: NEGLIGENT CARE AND SUPERVISION/NEGLIGENCE PER SE AS TO THE SCHOOL

63. Plaintiff alleges all previous paragraphs as if fully stated herein.

64. John has suffered multiple physical and emotional injuries due to the School's breach of its duty of care to reasonably ensure his safety and well-being.

65. The School was aware of John's high level of needs, yet they neglected him and left him lying despondent on a bean bag when he should have been receiving constant aid and assistance.

66. The School failed to provide John with adequate opportunities to eat causing continued weight loss and muscle atrophy to the point that he is no longer able to attend School.

67. Throughout the 2024-2025 school year, John suffered repeated and ongoing physical injuries due to the School's failure to exercise reasonable care. John regularly came home from School with unexplained bruises. While what led to the bruises covering the child or the blisters and injuries to his penis are unknown, it is certain that they occurred at School.  The videos taken by school staff appear to show him being allowed to injure himself or masturbating on video.  The School's dismissive response to Jane Doe's concerns about these injuries indicates either a lack of awareness regarding the cause of John's recurring bruises, which reflects inadequate supervision, or an intentional effort to conceal their true origin.

68. The School failed to reasonably protect John from harm when it allowed him to remain completely nude for periods of time while at school and allowed its employees to take photos of him and record videos of him in compromised states. At least one video depicts him completely nude on the school floor while other staff watched and also recorded the same.

69. John suffered physical injuries and emotional distress as a result of the School's failures to uphold its duty of care.

**COUNT II: NEGLIGENT HIRING/SUPERVISION/TRAINING/RETENTION AS TO THE SCHOOL**

70. Plaintiff alleges all previous paragraphs as if fully stated herein.

71. The School failed to train its employees to prevent, recognize, and report child abuse and neglect.

72. If the School had acted with reasonable diligence, it could have discovered that its employees were neglecting and abusing John. The School's failure to correct the actions of these employees or fire them caused the harm to continue.

73. The School allowed its employees to permit John to remain completely nude for periods of time while at school and allowed its employees to take photos and record videos of John completely nude. By failing to intervene or conduct disciplinary measures as a result of this conduct, the School effectively ratified this conduct.

74. If the School had exercised reasonable diligence in hiring, supervision, training, and retaining its employees who worked with John, then he would not have suffered injuries from prolonged abuse and neglect.

75. John suffered physical injuries and emotional distress as a result of the School's failures to uphold its duty of care.

## COUNT III: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS TO THE SCHOOL, DEFENDANT BUTTS, DEFENDANT SQUIRE, DEFENDANT BROWN, DEFENDANT JOHNSON, AND DEFENDANT EDWARDS

76. Plaintiff alleges all previous paragraphs as if fully stated herein.

77. John and Jane Doe have suffered severe emotional and psychological trauma as a result of the neglect and abuse inflicted by the School.

78. These incidents have led to significant increases in anxiety, agitation, and distress. As a result of the neglect and abuse he suffered at School, John began to have new anxiety about using the restroom. He also became catatonic and despondent because of the neglect and lack of stimulation he received during the school day. His emotional distress is also demonstrated by his increase in SIBs and aggressive behaviors while under the School's care.

79. Defendant Edwards caused John emotional distress when he allowed John to be left alone all day at School and when he photographed him and allowed him to video recorded while nude.

80. Defendant Johnson caused John emotional distress when she force fed him at School.

81. Defendants Butts, Squire, and Brown caused John emotional distress when they ratified the abuse and neglect that he was subjected to at School.

82. John's emotional suffering is greatly increased by the fact that he has almost no ability to communicate and advocate for himself. He was not able to tell his mother why he had sudden anxiety about going to the restroom or the fact that he was left completely isolated during entire school days. Instead, he suffered in silence for years.

83. Jane Doe has also suffered severe emotional distress because of her discovery that School employees, including Defendant Edwards, had photographed and video recorded her son completely nude. The video evidence provides irrefutable certainty that her son was sexually abused and exploited by his caretakers. She is entitled to her own separate claim

16

for emotional distress pursuant to *K.G. by Next Friend Ruch v. Smith*, 178 N.E.3d 300 (Ind. 2021).

84. Defendant Edwards's act of photographing John while nude went far beyond mere negligence, this conduct was willful, malicious, completely outside the scope of his employment, and for his own benefit. There is no reasonable explanation that would justify this conduct as furthering any business of the School.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO THE SCHOOL , DEFENDANT JOHNSON, AND DEFENDANT EDWARDS

85. Plaintiff alleges all previous paragraphs as if fully stated herein.

86. School employees, including Defendant Edwards, exhibited extreme and outrageous conduct when they allowed John, a disabled minor child to be completely nude at school and then took pictures and recorded videos of John.

87. Defendant Johnson exhibited extreme and outrageous conduct when she force fed John at School.

88. Defendants acted with reckless disregard toward John when they committed these acts.

89. As a result of this conduct, John suffered severe emotional distress.

### COUNT V: FAILURE TO ACCOMMODATE AS TO THE SCHOOL

90. Plaintiff alleges all previous paragraphs as if fully stated herein.

91. Throughout the 2022-2023, 2023-2024, and 2024-2025 school years, the School failed to accommodate John as required under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").

92. The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 28 C.F.R. § 35.130(a).

93. As such, the ADA requires public schools to provide accommodations to disabled students to allow them equal access to the educational environment.

94. Because of John's extensive disabilities, he requires accommodation at School. These accommodations include a constant one-to-one aide who is trained to communicate with a deaf-blind person. John is also required to have regular access to food due to his difficulty in maintaining his body weight. These accommodations are necessary to allow John to have equal access to his educational environment.

95. The School failed to accommodate John when it failed to provide him these reasonable accommodations that are necessary  for equal access to the educational environment.

96. When the School provided him with untrained aides who could not effectively communicate with him, or left him unattended and isolated, the School completely cut off John's access to the educational environment.

97. The School also failed to provide John access to his education when it continually required his mother to pick him up early or keep him home from School due to the School's staffing issues.

## COUNT VI: DISABILITY DISCRIMINATION AS TO THE SCHOOL

98. Plaintiff allege all previous paragraphs as fully stated herein.

99. Throughout the 2022-2023, 2023-2024, and 2024-2025 school years, the School discriminated against John because of his disabilities when the School failed to provide him the same services and benefits as non-disabled students.

100. The ADA prohibits public entities, including public schools, from discriminating against qualified individuals because of a disability. 42 U.S.C. § 12132.

101. Section 504 requires educational institutions to provide health-related services essential for students with disabilities to benefit from their education, including the administration of medication and other critical health interventions during the school day. Precedents such

as *San Ramon Valley (CA) Unified Sch. Dist., 18 IDELR 465 (OCR 1991)* and *Advanced Math & Science Acad. (MA), 65 IDELR 82 (OCR 2014)* reinforce the obligation of schools to deliver these services diligently.

102. The School violated 42 U.S.C. §12132, causing damage to John, by committing the following discriminatory acts or practices. These practices go beyond the denial of Free Appropriate Public Education (FAPE) but constitute direct disability-based discrimination.

103. The School discriminated against John when it allowed its employees to neglect, abuse and inflict physical injuries on John by leaving him isolated and alone for entire school days.

104. The School also discriminated against John when it allowed John to remain completely nude at school and allowed School employees to photograph and video record him completely nude—this would have never been permitted for a non-disabled child.

105. The School failed to provide the same degree of care to John as it did for non-disabled students when it failed to provide him with adequate opportunities to eat. It is medically necessary for John to receive adequate nutrition during the school day in order for him to maintain his weight. If a non-disabled student was sick and required a medically necessary medication to be administered at School, the non-disabled student would have received such care easily and without constant push-back.

106. The School failed to provide the same degree of care and safety to John, as it did for non-disabled students when the School failed to notify Jane Doe timely or accurately of the source of the bruises John was receiving at School. If a non-disabled student had been hurt at School, the non-disabled student would have been provided medical treatment, and the parent would have been contacted immediately.

### COUNT VII: § 1983 – STATE CREATED DANGER AS TO THE SCHOOL, DEFENDANT BUTTS, DEFENDANT SQUIRE, DEFENDANT BROWN, DEFENDANT JOHNSON, AND DEFENDANT EDWARDS

107. Plaintiff alleges all previous paragraphs as if fully stated herein.

108. Defendants acting under color of law, deprived John of rights, privileges, and immunities secured by the United States Constitution, including the right to due process under the Fourteenth Amendment. Specifically, Defendants violated John's right to be free from affirmative actions that increased his vulnerability or placed him in danger, while also depriving his mother of the ability to protect him.

109. Defendants acted with deliberate indifference when they subjected John to ongoing neglect and abuse.

110. As John's Teacher of Record, Defendant Edwards was well-aware of John's documented needs. Yet he willfully and maliciously left him to sit on a bean bag all day with no interaction. Defendant Edwards also willfully and maliciously photographed John while nude.

111. The School delayed informing Jane Doe that John was giving himself bruises at school until she inquired about it after noticing a pattern of suspicious and unexplained bruises that John received at School.

112. The School acted with deliberate indifference when it allowed John to remain nude while at school and allowed School employees to take photos of him and record videos of John highly upset and, in at least one case, completely nude.

113. John, a deaf-blind student who has almost no ability to communicate or advocate for himself, was uniquely vulnerable to this type of ongoing abuse and neglect. These vulnerabilities were well-known to the School, yet it failed to intervene to protect him.

114. By intentionally ignoring its duty to provide a safe learning environment, the School knowingly increased John's vulnerability to harm.

115. By their actions and inactions, Defendants affirmatively created and exacerbated the danger John faced, making him more susceptible to harm than he would have been had they fulfilled their legal and ethical obligations.

116. The several points of failure in the School's response to these incidents demonstrate more than a mere isolated lapse in judgment, but rather a broader pattern of systemic neglect, recklessness, and deliberate indifference by the School.

117. The state-created danger caused John significant emotional and psychological harm, demonstrated by his social isolation, emotional dysregulation, anxiety, depression, and regression in previously mastered skills.

118. Defendants' actions and inactions directly contributed to the deterioration of John's mental health and physical health.

119. As a direct result of Defendants' actions and omissions, John suffered physical, emotional, and psychological injuries, the effects of which continued to impact him and his family profoundly. Defendants' conduct constituted recklessness and gross disregard for John's safety and well-being that amounts to a state-created danger that could have been, and should have been, prevented.

**COUNT VIII: § 1983 – SPECIAL RELATIONSHIP AS TO THE SCHOOL, DEFENDANT BUTTS, DEFENDANT SQUIRE, DEFENDANT BROWN, DEFENDANT JOHNSON, AND DEFENDANT EDWARDS**

120. Plaintiff alleges all previous paragraphs as fully stated herein.

121. Defendants, acting under color of state law, violated John's Fourteenth Amendment right to substantive due process by failing to protect him after assuming a special relationship with him. Although, as a general matter, schools do not always have an affirmative constitutional duty to protect students from harm caused by private actors, exceptions arise where a "special relationship" exists between the state and the individual. This special relationship can emerge when the state, through its agents, takes on a custodial role or

otherwise places an individual in a circumstance of dependence and vulnerability, limiting the individual's ability to care for himself or to obtain help from others.

122. John's circumstances went far beyond the ordinary student-school relationship. John is both deaf and blind. This makes him completely dependent on the School as his caretaker during the school day. He has no ability to protect himself from harm and was completely reliant on the School's protection and guidance. By undertaking these obligations, the School affirmatively created a setting in which John and his parents relied on the School not merely to provide an education, but also to safeguard him from foreseeable harm.

123. The School's failure to uphold these responsibilities was not a mere omission, but a profound and willful abdication of its custodial role. Despite the School's knowledge of John's extensive needs, it allowed him to be neglected and abused.

124. The School took no meaningful steps to shield John from harm. Even when Jane Doe raised concerns about what was going on at School, the School took no steps to investigate or intervene.

125. Jane Doe entrusted the School with the care and supervision of her child, particularly because of his extremely high level of need for oversight and protective intervention. She trusted that the School, as a public school, would be equipped to provide her son with the level of support that he needed.

126. Defendant Edwards, as John's Teacher of Record, was aware of John's vulnerabilities and high level of needs, yet he neglected John, photographed him nude, and physically restrained him regularly.

127. As a direct and proximate result of Defendants' breach of this special relationship, John's constitutional rights were violated. He was robbed of the secure, supportive environment his circumstances entitled him to and was instead subjected to a pattern of ongoing abuse, neglect, and exploitation.

128. This violation of his substantive due process rights entitles John to relief under 42 U.S.C. § 1983. Defendants' deliberate indifference, failure to fulfill duties they willingly undertook, and conscious concealment of critical information from John's mother combined to create a profoundly dangerous situation—one that never should have existed in a setting pledged to his protection and support.

## COUNT IX: § 1983 – SHOCKS THE CONSCIENCE AS TO THE SCHOOL AND DEFENDANT EDWARDS

129. Plaintiff alleges all previous paragraphs as fully stated herein.

130. Defendants, acting under color of state law, deprived John of rights, privileges, and immunities secured by the United States Constitution, including his substantive due process rights under the Fourteenth Amendment.

131. Defendants' actions and omissions were not merely negligent or misguided; instead, they were so egregious, arbitrary, and abusive of power as to "shock the conscience." This constitutional protection guards against government behavior that displays a deliberate disregard for human dignity, health, safety, and life.

132. The School's deliberate indifference to John's suffering manifested in numerous ways that collectively created a dangerous situation and exposed him to escalating harm. Despite the School's knowledge that John is both deaf and blind and requires constant protection and assistance, the School still failed to protect him from an ongoing pattern of neglect, abuse, and exploitation. This created a clearly dangerous situation, particularly for a student as vulnerable as John.

133. The fact that School employees, including Defendant Edwards, allowed John to remain nude at school and took photographs and a video recording of John completely nude is particularly egregious and abhorrent. This act is inexcusable and without any reasonable explanation.

134. Defendant Edwards's acts of photographing John while nude and leaving him in isolation for extended periods of time *shocks the conscience*.

135. The School's willful inaction was so reckless and utterly indifferent to John's rights and well-being that it *shocks the conscience*. This pattern of conduct directly undermined John's constitutional protections, caused him preventable suffering, and stripped his parent of her ability to seek help for him. Accordingly, the School's behavior constitutes a violation of 42 U.S.C. § 1983.

**COUNT X – § 1983 – VIOLATION OF EQUAL PROTECTION AS TO THE SCHOOL, DEFENDANT BUTTS, DEFENDANT SQUIRE, DEFENDANT BROWN, DEFENDANT JOHNSON, AND DEFENDANT EDWARDS**

136. Plaintiff alleges all previous paragraphs as fully stated herein.

137. Defendants, acting under color of law, deprived John of rights, privileges, and immunities secured by the United States Constitution, including the right to equal protection under the Fourteenth Amendment.

138. Defendants treated John, as a student with disabilities, differently from non-disabled students.

139. John was left to sit alone and isolated in a bean bag all day during many school days. Defendant Edwards consistently called his mother to pick him up early or keep him home from School due to staffing issues. The School did not treat non-disabled students this way.

140. School employees, including Defendant Edwards, were permitted to take photos videos of John, even while he was completely nude. The School would not have allowed this to happen to a non-disabled child.

141. This disparate treatment lacked any rational basis and left John more vulnerable to harm. The Defendants' actions caused John significant suffering.

## COUNT XI - § 1983 – INADEQUATE POLICIES AND PROTECTION AS TO THE SCHOOL, DEFENDANT BUTTS, DEFENDANT SQUIRE, AND DEFENDANT BROWN

142. Plaintiff alleges all previous paragraphs as fully stated herein.

143. Defendants failed to implement adequate policies to address student supervision, staff supervision, intervention and support for high needs students, prevention of neglect and abuse, investigation of neglect and abuse, and reporting of neglect and abuse.

144. The Defendants' failure to have appropriate policies in place allowed this abuse and neglect to continue over the course of several years.

145. The lack of adequate policies, training, supervision, and accountability demonstrated deliberate indifference to the rights of John, making these systemic failures a driving force behind the violations of John's constitutional rights.

### RELIEF REQUESTED

WHEREFORE, Plaintiff requests the following relief:

146. Judgment in her favor and against the Defendants;

147. Damages in an amount sufficient to compensate her for the losses;

148. Pre- and post-judgment interest;

149. Punitive damages;

150. Costs of this action; and

151. All other relief reasonable in the premises.

Respectfully submitted, this 6th day of October, 2025.

Respectfully submitted,

*/s/ Tammy J. Meyer*
Tammy J. Meyer, #14612-49
METZGER ROSTA LLP
32 S. 9th Street
Noblesville, Indiana 46060
Telephone: (317) 219-4606
Facsimile: (317) 214-9437
Email: tammy@metzgerrosta.com

/s/Catherine Michael
Catherine Michael, #22474-49
Connell Michael, LLP
550 Congressional Ave., Suite 350-11
Carmel, IN 46032
Ph: 317-343-4482
Email: catherine@connellmichaellaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October 2025, a true and exact copy of the foregoing

was electronically filed.

Tammy J. Meyer, #14612-49
*Attorney for Plaintiffs*

METZGER ROSTA LLP
32 S. 9th Street
Noblesville, IN  46060
(317) 219-4606